FOR PUBLICATION

## IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA and the PEOPLE OF THE VIRGIN ISLANDS, | ) ) ) | |
| Plaintiffs, | ) ) | Criminal No. 2008-49 |
| v. | ) ) | |
| SHAWN TYSON and KELROY MORRELL, | ) ) | |
| Defendants. | ) ) | |

ATTORNEYS:

**St. Claire Theodore, AUSA**
**Ishmael Meyers, Jr., AUSA**
St. Thomas, U.S.V.I.
        *For the plaintiffs.*

**Leonard B. Francis, Esq.**
St. Thomas, U.S.V.I.
        *For defendant Shawn Tyson.*

**Darren John-Baptiste, Esq.**
St. Thomas, U.S.V.I.
        *For defendant Kelroy Morrell.*

## MEMORANDUM OPINION

**GÓMEZ, C.J.**

Before the Court is the motion of defendant Shawn Tyson for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On July 31, 2008, Tyson, a private second class in the

Tennessee National Guard, arrived at the Tri-Cities Regional

Airport in northeastern Tennessee in preparation for a flight to

St. Thomas, U.S. Virgin Islands.  Before boarding his flight,

Tyson declared several firearms to airline employees.  On arrival

in St. Thomas, Tyson was met by his co-defendant, Kelroy Morrell,

who had come to the airport by car.  An individual named Curtiss

Thomas was also in Morrell's car.

Unbeknownst to Tyson, federal law enforcement agents had

obtained a search warrant during his flight after being alerted

by authorities in Tennessee to the presence of firearms in

Tyson's luggage and determining that Tyson did not have a federal

firearms license.

While law enforcement agents at the airport on St. Thomas

watched from a distance, Tyson retrieved his luggage from a

baggage carousel and left the baggage claim area.  He placed his

luggage in the trunk of Morrell's car and entered the car.  The

car then proceeded to the airport exit.  Within moments of the

car's departure from the airport, law enforcement agents stopped

it and arrested Tyson and Morrell.[1]

After Tyson and Morrell were taken into custody, the agents

---

[1]  Curtiss Thomas was also arrested and separately indicted
on several firearms-related charges.  At the conclusion of a
trial in this Court, a jury acquitted Thomas.

obtained Morrell's written consent to search his car and discovered several firearms and ammunition inside. Law enforcement agents later searched Tyson's computer, camera and cellular telephone, discovering various images of Tyson and other individuals discharging and posing with firearms.

In October 2008, Tyson and Morrell were indicted on a total of twenty-seven counts between them. Tyson was charged with one count of conspiracy to traffic firearms in violation of 18 U.S.C. § 371; twelve counts of trafficking firearms in interstate and foreign commerce in violation of 18 U.S.C. § 922(a)(1)(A); eleven counts of unauthorized possession of a firearm in violation of V.I. CODE ANN. tit. 14, § 2253(a); one count of transferring a firearm to be used in a crime in violation of 18 U.S.C. § 924(b); and one count of transferring firearms to an out-of-state resident in violation of 18 U.S.C. § 922(a)(5) and 18 U.S.C. § 924(a)(1)(D).

A three-day trial was held in January 2009. At the close of the government's case-in-chief, Tyson moved for relief pursuant to Federal Rule of Criminal Procedure 29. The Court took the motion under advisement.[2] On the third day of trial, the jury found Tyson guilty on all charges save for one count of

---

[2] The Court has not ruled on that motion.

unauthorized possession of a firearm.[3]

Tyson now renews his motion for a judgment of acquittal on all charges on which he was found guilty pursuant to Rule 29.[4]

---

[3] The jury acquitted Morrell of all charges.

[4] After the jury returned its verdict on January 16, 2009, Tyson, with no objection from the government, asked for an extension of time to file post-trial motions. The Court granted that motion and allotted Tyson thirty days from the date of his transcript request to file post-trial motions. Tyson filed his transcript request on January 28, 2009. The transcript was filed on March 10, 2009. On April 13, 2009, Tyson filed his Rule 29 motion, well after the thirty days from the transcript request allotted by the Court. The Court recognizes that the transcript was not filed until after the thirty-day period had expired. The responsibility for seeking more time to file post-trial motions, however, lay squarely on Tyson's shoulders. The record does not reflect that he sought additional time. As such, Tyson's renewed Rule 29 motion is clearly untimely. That untimeliness is not necessarily a bar to its consideration, however, as the Supreme Court has made clear that the time limits imposed by Rule 29, while rigid and mandatory, are not jurisdictional. *See Eberhart v. United States*, 546 U.S. 12, 19 (2005) (per curiam) (stating that Rule 29 "is a claim-processing rule -- one that is admittedly inflexible because of Rule 45(b)'s insistent demand for a definite end to proceedings").

In *Eberhart*, the Court clarified that given Rule 29's non-jurisdictional nature, the untimeliness of a motion brought under that rule is subject to waiver or forfeiture by the opposing party. *See id.* Here, the government has not, in either its initial opposition or supplemental opposition papers, raised the issue of the untimeliness of Tyson's motion, and thus has forfeited its right to object. *See, e.g., United States v. Hope*, 487 F.3d 224, 227 n.6 (5th Cir. 2007) ("[T]he government failed to preserve a timeliness objection [to the defendant's Rule 29 motion]; accordingly, we consider this argument forfeited."); *United States v. Robinson*, 430 F.3d 537, 542 (2d Cir. 2005) ("[T]he government forfeited its objection to the untimeliness of Robinson's motion by failing to raise the objection in a timely fashion and not raising the issue until after the court had granted Robinson's motion for a new trial" (footnote omitted)).

The government opposes the motion on the merits.[5]

## II. <u>DISCUSSION</u>

In ruling on a motion for a judgment of acquittal made pursuant to Federal Rule of Criminal Procedure 29, a district court must "'review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt beyond a reasonable doubt based on the available evidence.'" *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002) (quoting *United States v. Wolfe*, 245 F.3d 257, 262 (3d Cir. 2001)); *see also United States v. Jannotti*, 673 F.2d 578, 598 (3d Cir. 1982) (en banc). An insufficiency finding should be "'confined to cases where the prosecution's failure is clear.'" *Smith*, 294 F.3d at 477 (quoting *United States v. Leon*, 739 F.2d 885, 891 (3d Cir. 1984)). "Courts must be ever vigilant in the context of [Rule] 29 not to usurp the role of the jury by weighing credibility and assigning weight to the evidence, or by substituting its judgment for that of the jury." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (citations omitted); *see also United States v. Ashfield*, 735 F.2d 101, 106 (3d Cir. 1984)

---

[5] After the parties submitted briefs, the Court ordered supplemental briefs. The government timely filed its supplemental brief. Tyson filed his supplemental brief out of time. He never asked for or received permission to do so. The day after the briefs were due, Tyson submitted an "amended" motion for a judgment of acquittal.

("Our task is not to decide what we would conclude had we been the finders of fact; instead, we are limited to determining whether the conclusion chosen by the factfinders was permissible.").

### III. ANALYSIS

Tyson does not explicitly argue that the government failed to meet its burden of proof with respect to every element of each count on which he was convicted. He merely contends, in conclusory fashion, that "no rational juror could find him guilty of the offense[s] charge[d]." (Def. Tyson's Mem. Supp. Rule 29 at 1.)

### A. Count One: Conspiracy to Traffic Firearms

Count One of the indictment charged Tyson with conspiracy to traffic firearms in violation of 18 U.S.C. § 371. To sustain Tyson's conviction on that count, the record must contain sufficient evidence that: (1) there was an agreement between two or more persons to traffic firearms; (2) Tyson knowingly joined the agreement; and (3) one of the conspirators committed an overt act in furtherance of the conspiracy. *See United States v. Gebbie*, 294 F.3d 540, 544 (3d Cir. 2002) (citing *United States v. Conley*, 37 F.3d 970, 976-77 (3d Cir. 1994)).

Although a court must pay "close scrutiny" to the government's evidence in conspiracy cases, *United States v.*

*Coleman*, 811 F.2d 804, 807 (3d Cir. 1987), each element of
conspiracy may "be proven entirely by circumstantial evidence,"
*United States v. Brodie*, 403 F.3d 123, 134 (3d Cir. 2005)
(citations omitted). Furthermore, while "slight evidence of a
defendant's connection with a conspiracy is insufficient to
support a guilty verdict," *Coleman*, 811 F.2d at 807 (quoting
*United States v. Allard*, 240 F.2d 840, 841 (3d Cir. 1957)), the
proper inquiry is whether "all the pieces of evidence, taken
together, make a strong enough case to let a jury find the
defendant guilty beyond a reasonable doubt." *Brodie*, 403 F.3d at
134 (alteration, quotation marks and citations omitted). Proof
that the objective of the conspiracy has been completed is
unnecessary for conspiracy liability to attach. *See United States
v. Conley*, 37 F.3d 970, 981 n.15 (3d Cir. 1994); *United States v.
Uzzolino*, 651 F.2d 207, 214 n.13 (3d Cir. 1981) (stating that
"jury could properly have found appellee guilty of conspiracy
without finding that he had committed substantive violations in
furtherance of that conspiracy").

The government's evidence of conspiracy is as follows.
Several Tennessee-based, federally licensed firearms dealers
testified that Tyson purchased various firearms from them over a
several-month period. (Trial Tr. vol. 1, 265-68, 275-77, Jan. 14,
2009; vol. 2, 9-11, 21-24, 34-35, 74-77, Jan. 15, 2009.) All

told, Tyson purchased thirty-five firearms from December 2007

until July 2008. (*Id.* at vol. 2, 310.)  Of those thirty-five

firearms, law enforcement officials recovered only twelve. (*Id.*)

On February 14, 2008, Chesney Griffin, a Bristol Tennessee

Police Department officer, responded to a 911 call about gunfire

at a residence located at 348 Rosedale Lane in Bristol,

Tennessee. (*Id.* at vol. 1, 41-42.)  Tyson, Morrell and an

individual named Sherry Wagner were all found inside the

residence.  A search of the residence revealed the presence of

several firearms, firearm boxes, receipts for firearm purchases

and ammunition magazines. (*Id.* at vol. 1, 59, 65-68.)

Bob De Lugo, a Delta Air Lines station manager for St.

Thomas and St. Croix, U.S. Virgin Islands, testified that Tyson

traveled on various occasions from Tennessee to the Virgin

Islands. (*E.g.*, *id.* at vol. 1, 168-72.)  On at least two of those

occasions -- on February 20, 2008 and July 31, 2008 -- Tyson

traveled with firearms. (*Id.* at vol. 1, 204-06, 210-16.)  Tyson

told airline personnel that he had buyers for his firearms in the

Virgin Islands. (*Id.* at vol. 1, 227-28.)  On at least one

occasion, Tyson traveled with Morrell, both of whom were found to

be carrying luggage with firearms inside. (*Id.* at vol. 1, 217-18,

221.)

Morrell testified that Tyson and he on one occasion went

together in Sherry Wagner's car to a firearms store in Tennessee. Morrell testified about videotaping the area around the store and identified Tyson inside the store in an image taken from that videotape. (*Id.* at vol. 2, 470-71.) When asked whether he had purchased firearms or whether there were firearms in the car that day, Morrell responded in the negative. (*Id.* at vol. 2, 472.) When the government showed Morrell other images and asked whether they exhibited the presence of firearms in Wagner's car that day, Morrell responded in the affirmative. (*Id.* at vol. 2, 472-73.)

The government also presented unrefuted testimony that Tyson traveled to the Virgin Islands on July 31, 2008 with luggage that was full of firearms. (*E.g.*, *id.* at vol. 1, 233; vol. 2, 41, 51). Elfreda Robinson, the supervisor of the Virgin Islands Police Department's ("VIPD") Firearms Bureau for the District of St. Thomas/St. John/Water Island, answered "no" when asked on direct examination whether Tyson had registered any firearms in the Virgin Islands. (*Id.* at vol. 2, 269.) On arrival at the airport in St. Thomas, Tyson met Morrell and Curtiss Thomas, packed the firearms into Morrell's car, and left the airport with Morrell and Thomas.

The government also presented evidence that an individual named Jelani LaTorre wired $330 to Tyson in Tennessee on January 31, 2008. (*Id.* at vol. 2, 307-08.) On June 30, 2008, Ludrick

Thomas, a supervisor with the Virgin Islands Police Department
Traffic Bureau, stopped LaTorre for a traffic violation and found
in his possession a firearm with an obliterated serial number.
(*Id.* at vol. 2, 108-10.)  The government elicited testimony that
Tyson had previously purchased that firearm in Tennessee. (*Id.* at
vol. 2, 308-09.)

In the Court's view, a reasonable jury viewing the evidence
outlined above, taken as a whole, could not find that Tyson and
at least one other person agreed to traffic firearms and took
steps to achieve that objective.[6]

It is, of course, well-settled that an individual can be
convicted of a conspiracy with unknown persons. See *United States*

_____

[6]  In response to the Court's order for supplemental
briefing, the government, with respect to Tyson's conspiracy
conviction, had this to say:

The proof of the conspiracy overlaps with the proof for
the substantive counts in the indictment.  Therefore,
the government will rely on the record excerpts raised
in the sections cited below as support for upholding
Count One of the indictment.

(Pl.'s Rule 29 Supp. Br. 1.)

It is axiomatic that "conspiracies and substantive offenses
contain different elements[.]" *United States v. Watkins*, 339 F.3d
167, 177 (3d Cir. 2003); *see also United States v. Riviere*, 924
F.2d 1289, 1306 (3d Cir. 1991) (noting that "conspiracy and the
substantive offense that was the sole object of the conspiracy .
. . clearly require proof of different elements").  The
government's position that it could rely on proof of some other
crime to sustain Tyson's conspiracy conviction is not easily
reconciled with that well-settled conspiracy principle.

*v. Obialo*, 23 F.3d 69, 72 (3d Cir. 1994) ("The failure of the government to be able to name and personally identify the other conspirator is not fatal to a conspiracy conviction."); *United States v. Allen*, 613 F.2d 1248, 1253 (3d Cir. 1980) ("'The identity of the other members of the conspiracy is not needed, inasmuch as one person can be convicted of conspiring with persons whose names are unknown.'") (quoting *Rogers v. United States*, 340 U.S. 367, 375 (1951)). There must, however, be evidence of the participation of at least one other person. *See Obialo*, 23 F.3d at 72; *see also Government of Virgin Islands v. Hoheb*, 777 F.2d 138 (3d Cir. 1985) (affirming a conspiracy conviction where the defendant repeatedly referred to the involvement of a third person in his conversations with a confidential informant).

The Third Circuit Court of Appeals has vacated conspiracy convictions where the government failed to adduce sufficient evidence of an agreement between the defendant and some other person, whether identified or unidentified, to commit an unlawful act.

In *United States v. Pressler*, 256 F.3d 144 (3d Cir. 2001), Daniel Pressler and Scott Shreffler were convicted of conspiracy to distribute heroin. Shreffler appealed his conviction on sufficiency-of-the-evidence grounds. The evidence at trial

showed that Shreffler distributed a large amount of heroin to

many individuals on several occasions.  Sometimes accompanied by

his friends Anthony and Aaron Forshey, Shreffler obtained the

heroin in Philadelphia, usually from Pedro Caban.  The people to

whom Shreffler sold heroin had other supply sources, including

Pressler, and some of those people also sold heroin themselves.

While acknowledging that "Shreffler bought a large amount of

heroin from Caban, and sold heroin to a large number of people,"

the Third Circuit noted that "a conspiracy requires an agreement

to commit some other crime beyond the crime constituted by the

agreement itself." *Id.* at 151 (quotation marks and citation

omitted).  The court first considered whether there was

sufficient proof that Shreffler had conspired with Caban and the

Forsheys, all of whom were named in the indictment:

> Both Aaron and Anthony Forshey traveled with Shreffler
> to Philadelphia numerous times to acquire heroin, but
> both also often went without him.  The Forsheys
> originally purchased heroin from street dealers, but
> Shreffler eventually introduced them to Caban,
> explaining that Caban offered a "safer" way to purchase
> the drug.  Shreffler bragged to the Forsheys that his
> purchases from Caban were so sizeable that they were
> responsible for "taking [Pete] off the street" and
> allowing Caban to sell heroin directly out of his
> house.

*Id.* at 153 (quotation marks and alteration in original).  The

court found these facts insufficient to show an agreement between

Shreffler and Caban to distribute heroin to the Forsheys, because

"all that the evidence showed was that Shreffler introduced the

Forsheys to another, superior source of supply from which

Shreffler himself had purchased a large amount of heroin." *Id.*

The court likewise concluded that there was insufficient evidence

to show that Shreffler conspired with the Forsheys.  The court

reasoned that "the fact that the Forsheys and Shreffler knew that

they were involved in the same 'business' (in this case, the

distribution of heroin) and that they obtained much of their

supply from the same 'distributor' (Caban) simply does not

establish that they agreed to pool their 'efforts.'" *Id.* at 153

(quotation marks in original).

The Third Circuit next determined whether there was enough

proof that Shreffler had conspired with Charles Stoner.  Stoner

was not named in the indictment and had accompanied Shreffler

several times to Philadelphia on heroin runs:

> Shreffler was one of the people who introduced Stoner
> to Caban, and the latter later became a major source of
> supply for the former.  Shreffler essentially lived
> with Stoner for four or five months.  During that time,
> both Shreffler and Stoner sold heroin out of Stoner's
> home, and people would call seven or eight times a day
> about purchasing heroin.  Stoner obtained some of his
> heroin from Shreffler, and would sometimes sell heroin
> to those who came to his house looking for Shreffler
> when the latter was not present.

*Id.* at 154 (quotation marks omitted).  The court noted that

"Shreffler and Stoner lived together for several months, and both

of them sold drugs out of their shared residence on a daily

basis." *Id.* The court further took stock of the fact that "Stoner would sometimes supply drugs to customers when Shreffler was not available to do so." *Id.* at 155. In the court's view, however, "standing alone, all that this evidence proved was that Shreffler and Stoner were drug dealers who lived together for a time; it would not . . . be enough to show the existence of an agreement between them." *Id.* The court reasoned that "there was no testimony that Shreffler or Stoner ever served as a lookout for the other"; "there was no evidence of . . . conversations [about setting a sales price] between Shreffler and Stoner"; and there was no evidence that they spoke in code or offered to provide physical protection for each other.

The *Pressler* Court highlighted the fact that "[t]he only direct evidence of an agreement between Shreffler and Stoner was a single sentence in James Walker's testimony." *Id.* Walker testified that "Stoner 'would sell for Scott when Scott wasn't around.'" *Id.* (quotation marks in original). The Third Circuit concluded that that testimony alone was insufficient because "it is unclear what Walker meant by the critical statement or the basis upon which he made it." *Id.* at 156. Thus, [b]ecause the Government never demonstrated the existence of an agreement between Shreffler and at least one other person," *id.*, the court vacated Shreffler's conspiracy conviction.

In *United States v. Obialo*, Sunday Obialo was convicted of
conspiracy to possess with intent to distribute heroin in
violation of 21 U.S.C. § 846.  The evidence at trial showed that
he moved into an apartment in Philadelphia in 1992 and began
discussing with his neighbor, Jeffrey Bahamonde, the possibility
of distributing heroin.  Bahamonde, unbeknownst to Obialo, was a
police informant.  Obialo gave Bahamonde a matchbook of brown
heroin to show to a prospective client and later showed him a
large amount of heroin wrapped in a plastic sheet.  A few months
later, police officers executed a search warrant at Obialo's home
and found heroin tying him to the home of his uncle, Patrick
Nweze.  The officers next went to Nweze's home, where Nweze
consented to a search.  The officers found large quantities of
heroin in Nweze's home.  Obialo and Nweze were both charged with
and convicted of conspiracy.  The district court granted Nweze's
motion for a judgment of acquittal.  Obialo also moved for Rule
29 relief, arguing that he could not have conspired with anyone
in light of the vacatur of Nweze's conviction.  The district
court denied the motion because the indictment alleged that
Obialo conspired with unknown persons.

The Third Circuit reversed.  The court recognized that
"[t]he failure of the government to be able to name and
personally identify the other conspirator is not fatal to a

conspiracy conviction." *Obialo*, 23 F.3d at 72 (citation omitted).

The court then reviewed two of its precedents in which it had

found sufficient evidence to support the inference that the

defendant had formed an agreement with an unknown third party.[7]

---

[7] The Third Circuit discussed its decisions in *United States v. Allen*, 613 F.2d 1248 (3d Cir. 1980), and *Government of Virgin Islands v. Hoheb*, 777 F.2d 138 (3d Cir. 1985).  In *Allen*, the court affirmed Allen's drug-trafficking conspiracy conviction where, although his co-defendant was acquitted, Allen

> left a message with his answering service with detailed instructions for a third person using the name "Stewart;" that "Stewart" retrieved Allen's message; that he proceeded to a motel directed by Allen's message; that a call was made to Allen's answering service from that motel leaving a message with the room number; that someone came to the hotel and asked for that room; that a truck in the parking lot was listed in the motel records as belonging to that room; and that Allen was arrested the next day in possession of the keys to the truck which contained the marijuana.

*Obialo*, 23 F.3d at 72 (citing *Allen*, 613 F.2d at 1253).  In *Hoheb*, the Third Circuit affirmed Hoheb's drug conspiracy conviction even though his co-defendant, Parrilla, was acquitted where

> Hoheb had drafted a timetable detailing the transfer at sea of the drugs which included not only Parrilla but also another person.  Moreover, Hoheb repeatedly referred to the involvement of a third person in his conversations with the confidential informant, even naming that person the day before the transfer was to take place, and Parrilla also had made statements that referred to the involvement of his friend.  This was sufficient to permit the jury reasonably to infer that there was an agreement with a third person, albeit unidentified.

*Id.* at 72-73.

The court contrasted those cases with the evidence adduced

against Obialo, finding that "the government presented no

evidence to support the inference that Obialo conspired with

*anyone*." *Id.* (emphasis in original) (footnote omitted).  The

court considered and rejected the government's efforts to show

the existence of a conspiracy, finding that all such efforts were

"based on sheer speculation":

> The government argues that Obialo's statement to
> Bahamonde that he could retrieve a large quantity of
> heroin within two hours from New York demonstrated the
> existence of a conspirator in New York.  That statement
> alone does not support a reasonable inference of an
> involved other person. . . . Even if Obialo did have to
> go to New York, there is no reason to assume he would
> acquire the drugs from another person as distinguished
> from his own stockpile.
>
> . . . .
>
> Nor is there any evidence from which the jury could
> reasonably conclude that Obialo had an agreement with
> importers who posed as students based on his statement
> to Bahamonde that "they" imported heroin that way.
> Obialo said nothing from which Bahamonde or the jury
> could conclude that he had such an agreement, and thus
> he made no admissions such as supported the finding of
> a conspiracy in Hoheb.
>
> . . . .
>
> Finally, the government argues that the jury could find
> the existence of a conspirator from the sheer amount of
> heroin . . . that Obialo possessed and his financial
> problems, leading to the inference that Obialo had
> purchased the heroin on credit.  Although the amount of
> drugs has been held to be a basis on which the
> factfinder can infer intent to distribute, the
> substantial amount of heroin that Obialo possessed is
> not sufficient, either by itself or in conjunction with

> the other evidence noted by the government, to support
> the inference of conspiracy.

*Id.* at 73.

While the authority cited above admittedly addresses drug

conspiracies, the need for proof of an agreement is an essential

element of every conspiracy. *See*, *e.g.*, *United States v. Davis*,

965 F.2d 804, 813 (10th Cir. 1992) (reversing a conviction for

conspiracy to use interstate commerce to facilitate the bribery

of a public official where there was "insufficient evidence of a

conspiratorial agreement" between the defendant and some other

person); *United States v. Parker*, 839 F.2d 1473, 1478 (11th Cir.

1988) (finding insufficient evidence of a § 371 mail fraud

conspiracy where the government's best evidence showed only the

defendants' presence at a meeting and because, "[w]hile the

evidence clearly shows that the law was violated, there is

insufficient evidence of a common agreement.  Without evidence

showing or tending to show a meeting of the minds to commit an

unlawful act, the convictions cannot stand").

Here, as in the cases cited above, the government has failed

to show any integration of activities between Tyson and any other

individual that could indirectly prove the existence of a

preconceived plan or common understanding to traffic firearms.

The government did not, for instance, introduce any

communications between Tyson and anyone else about a plan to sell

firearms.  The government also failed to present any evidence of
Tyson planning to sell, attempting to sell or actually selling
firearms as part of an agreement with some other individual.  To
the extent the government relies on Tyson's statement to airline
personnel -- that "he was an antique gun buyer and collector, and
that he had a purchaser for all of the guns when he got back to
the islands," (Trial Tr. vol. 1, 227-28) -- that statement, at
best, is aspirational and self-laudatory.  Significantly, it does
not demonstrate the existence of an agreement with someone else
to sell or traffic in firearms. *Cf. United States v. Allah*, 130
F.3d 33, 46 (2d Cir. 1997) (concluding that there was sufficient
evidence of an agreement where, among other things, the defendant
used the pronoun "we" when describing his and his coconspirator's
"inventory and methods of doing business").

For similar reasons, the government also cannot rely on
testimony about a firearm Tyson purchased in Tennessee that was
later found in St. Thomas in the possession of an individual who
had some time earlier wired money into an account held by Tyson.
That evidence, like Tyson's statements to airline personnel,
indicates that Tyson may have sold a firearm.  However, to the
extent that testimony highlights only unilateral conduct by
Tyson, it cannot serve to establish the existence of an agreement
with some other person to sell firearms.

The government adduced evidence that Tyson, Morrell and Sherry Wagner were found together in a house in Tennessee where firearms and related paraphernalia were discovered. The government also demonstrated that Tyson, Morrell and Wagner went together to a shooting range in Tennessee where they engaged in target practice. To the extent the government relies on that evidence to show the existence of an agreement between Tyson and either Morrell or Wagner, or both, such reliance is misplaced. It is axiomatic that a defendant's mere presence does not suffice to show that he agreed with at least one other person to commit an unlawful act. *See*, *e.g.*, *United States v. Rodriquez-Valdez*, 209 Fed. Appx. 178, 180-81 (3d Cir. 2006) (unpublished) (reversing a conviction for conspiracy to possess with intent to distribute cocaine where the defendant was found on a boat suspected of drug-trafficking because his "presence on the boat is . . . too slender a reed upon which to base a finding that he was aware . . . that drugs, as opposed to some other form of contraband, were involved"). Indeed, unlike *Rodriquez-Valdez*, where "the jury undeniably could have concluded that [the defendant's] presence on the boat signaled an understanding that he was engaged in an illicit transaction," *id.* at 181, here, the government did not even present any evidence whatever that Tyson was involved in some illicit activity.

The other evidence the government proffered shows that Tyson purchased approximately thirty-five firearms over a several-month-long period. He made some of those purchases alone. On other occasions, he may have been accompanied. The problem for the government is that Tyson's purchases of firearms are neither unlawful on their own nor supportive of the existence of a conspiracy when viewed in conjunction with the other evidence in this case. *Cf. Allah*, 130 F.3d at 45 ("The evidence that Hamilton was aware that his conduct was illegal included his acting as a lookout for that first gun sale -- during which there was a shouted alarm that the police were in the area -- and his subsequent refusal to ride with Rosado while Rosado was transporting the just-purchased guns."). Moreover, to the extent those purchases could be taken to suggest the existence of an agreement to buy firearms and to do something with them, there is insufficient evidence in the record from which to infer that that something was selling those firearms for profit, as alleged in the indictment.

No rational jury could have inferred that Tyson entered into the necessary conspiratorial agreement with some other person based on his purchases of firearms and travels to St. Thomas as well as his conversations with airline personnel. Accordingly, the Court will grant Tyson's motion as it pertains to Count One.

B.   **Counts Two through Thirteen: Trafficking Firearms in Interstate and Foreign Commerce**

Counts Two through Thirteen of the indictment charged Tyson with trafficking firearms in interstate and foreign commerce in violation of 18 U.S.C. § 922(a)(1)(A).[8]  To prove as much, the government had to show that Tyson (1) engaged in the business of dealing in firearms; (2) was not then a federally licensed firearms dealer; and (3) acted willfully. *See* 18 U.S.C. § 922(a)(1)(A); *United States v. Sanchez-Corcino*, 85 F.3d 549, 554 (11th Cir. 1996).

Here, the evidence adduced at trial sufficiently establishes that Tyson was not a federally licensed firearms dealer.  Penny Stricklin, an agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF"), testified about a certified document from the Federal Firearms Licensing Center.  According to Stricklin, that document indicated that Tyson "does not have a federal firearms license." (Trial Tr. vol. 2, 279.)

The problem for the government is the first element of a § 922(a)(1)(A) offense.  When Congress enacted the Gun Control Act of 1968, Pub. L. No. 90-618, 82 Stat. 1223 (1968), it did not define "engaged in the business of dealing in firearms." *See United States v. Breier*, 813 F.2d 212, 213 (9th Cir. 1987); *see*

_____

[8]  Counts Two through Thirteen each charged Tyson with trafficking a different, specific firearm.

*also Bryan v. United States*, 524 U.S. 185, 186 (1998) ("The 1968 Act . . . omitted any definition of the term 'engaged in the business' even though that conduct was an element of the unlawful act prohibited by § 922(a)(1)."); *United States v. Day*, 476 F.2d 562, 567 (6th Cir. 1973) ("There is no statutory standard defining 'engaged in business.'"); *United States v. Zeidman*, 444 F.2d 1051, 1055 (7th Cir. 1971) ("The statute does not prescribe any standards for determining when a person is 'engaged in the business.'"). That definitional gap opened the door to judicial interpretation. *See Breier*, 813 F.2d at 213, 216 ("Courts have fashioned their own definitions of the term. . . . Congress was well aware of the judicial interpretations of the term 'engaged in the business.'" (footnote omitted)); *United States v. Schumann*, 861 F.2d 1234, 1237 n.2 (11th Cir. 1988) ("[T]he term 'engaged in the business' as it relate[s] to the sale of firearms [is] subject to judicial interpretation." (citations omitted)); *see also*, *e.g.*, *United States v. Wilmoth*, 636 F.2d 123, 125 (5th Cir. 1981); *United States v. Swinton*, 521 F.2d 1255, 1258 (10th Cir. 1975) ("This Court has not heretofore considered the scope of the language 'engaged in the business of dealing in firearms.'"); *Day*, 476 F.2d at 567 (defining the phrase based on case law).

In 1986, the Firearms Owners' Protection Act, Pub. L. No.

99-308, § 101, 100 Stat. 449, 450 (1986), was signed into law.

Among other things, it amended the Gun Control Act of 1968 by

adding a definition of "engaged in the business of dealing in

firearms." The new definition has effectively raised the

evidentiary bar for the government by restricting the definition

of what constitutes a firearms dealer and "engaged in the

business". *See Martin v. United States*, 989 F.2d 271, 274 n.4

(8th Cir. 1993) (noting that the 1986 amendment has "*narrow[ed]*

*the class of persons* for whom certain conduct is prohibited"

(emphasis supplied)); *Schumann*, 861 F.2d at 1237 (noting that the

1986 amendment "substituted, inter alia, *a narrower definition* of

'dealer' by further defining the term 'engaged in the business'"

(emphasis supplied)); *Breier*, 813 F.2d at 216 (stating that

Congress "enacted new §§ 921(a)(21) and 921(a)(22) *in order to*

*limit the conduct deemed to be criminal*" (emphasis supplied)).

Under the 1986 amendment, to be "engaged in the business of

dealing in firearms" means to devote "time, attention, and labor

to dealing in firearms as a regular course of trade or business

with the principal objective of livelihood and profit through the

repetitive purchase and resale of firearms[.]" 18 U.S.C. §

921(a)(21)(C). "In determining whether one is engaged in the

business of dealing in firearms, the finder of fact must examine

the intent of the actor and all circumstances surrounding the

acts alleged to constitute engaging in business." *United States v. Palmieri*, 21 F.3d 1265, 1268 (3d Cir. 1994), *vacated on other grounds*, 513 U.S. 957 (1994). "This inquiry is not limited to the number of weapons sold or the timing of the sales." *Id.* "For example, the location of the sales, the time and conditions under which the sales occur, the defendant's behavior before, during and after the sales, the price charged for and characteristics of the firearms sold, and the intent of the seller are all potentially relevant indicators of whether one has 'engaged in the business' of dealing." *Id.* at 1268. A person does not "engage in the business of dealing" if he "makes occasional sales, exchanges, or purchases of firearms for the enhancement of a personal collection or for a hobby, or . . . sells all or part of his personal collection of firearms." 18 U.S.C. § 921(a)(21)(C); *Bryan*, 524 U.S. at 188 n.5.

As noted above, under the 1986 amendment to § 922(a)(1)(A), a defendant's activity is criminal under that statute if his purchase and resale of firearms: (1) is repetitive; (2) constitutes a regular course of trade or business; and (3) is done with the principal objective of livelihood and profit. *See* 18 U.S.C. § 921(a)(21)(C). The Court does not believe that the evidence adduced at trial, viewed in a light most favorable to the government, satisfies those essential elements. After an

intensive review of the record, the Court has pinpointed several
types of evidence that only tenuously suggest that Tyson engaged
in firearm sales for profit.

First, the government introduced unrefuted evidence that
Tyson purchased several firearms from various federally licensed
firearms dealers in Tennessee.  The government coupled that
evidence with the testimony of Adam Eric Moore, an assistant vice
president and compliance officer with First Bank & Trust.  Moore
testified that Tyson had three joint bank accounts at that bank
with Sherry Wagner.  Moore also testified about fluctuations not
exceeding several hundred dollars in the balances of those
accounts over a several-month period.  Those fluctuations
included occasional overdrafts. (Trial Tr. vol. 2, 90-93.)

Second, Tyson made several trips over several months from
Tennessee to St. Thomas. (*Id.* at vol. 1, 168-72.)  Before
embarking on one of those trips, on July 31, 2008, Tyson was
found to have firearms in his suitcase. (*Id.* at vol. 2, 51-52.)
He boarded a St. Thomas-bound plane.  On arrival, he entered a
car that police stopped shortly thereafter.  Tyson was
subsequently taken into custody.

Dudley Breeding, an airline ticket agent at the Tri-Cities
Airport in Tennessee, testified that she processed Tyson's
airline tickets on four separate occasions.  According to

Breeding, on more than one of those occasions Tyson was traveling

with firearms.  Breeding testified that Tyson, before boarding a

flight to St. Thomas on July 31, 2008, told her that "he was an

antique gun buyer and collector, and that he had a purchaser for

all of the guns when he got back to the islands." (*Id.* at vol. 1,

227-28.)  Stricklin, the ATF agent, testified that Tyson, upon

landing on St. Thomas after that flight, was found with at least

nine firearms in his luggage. (*Id.* at vol. 2, 313.)  Breeding

additionally testified that "[e]very time [Tyson] flew, that I

was on duty, we always had a very nice discussion, and that he,

he was bringing the guns back, either collecting them or had a

buyer for them." (*Id.* at vol. 1, 228.)

Finally, the government introduced a notepad obtained from

the Tennessee residence in which Tennessee police officers found

Tyson, Morrell and Sherry Wagner after responding to a 911 call.

Jamie Jenkins, an ATF special agent, testified that the notepad

contained lists of firearms and their calibers with corresponding

dollar amounts.[9] (*Id.* at vol. 1, 155-56.)

All of the evidence outlined above, taken together, perhaps

may have been sufficient to find Tyson guilty of violating §

922(a)(1)(A) before the 1986 amendment circumscribed the

---

[9]  The notations that Jenkins indicated were dollar amounts
are standalone numerical figures, unaccompanied by currency
signs.

definition of "engaged in the business." Tyson, however, was not

charged pre-1986. The government was therefore obligated to

prove the statutory elements set forth at § 921(a)(21)(C). In

the Court's view, the government fell short of that obligation.

The government did not, for instance, establish that Tyson's

purchases of firearms constituted "a regular course of trade or

business." Indeed, apart from showing that Tyson was a National

Guardsman, the government failed to introduce any evidence of

Tyson's business or income-generating activities of any kind.

There is, in other words, no frame of reference within which to

infer that Tyson's firearms purchases constituted a course of

trade or business, regular or otherwise.

The government similarly did not present any evidence that

Tyson's firearms purchases and travels to the Virgin Islands were

carried out "with the principal objective of livelihood and

profit." Indeed, post-1986 amendment courts have reversed §

922(a)(1)(A) convictions in the absence of proof that a

defendant's firearms sales were for profit. *See*, *e.g.*, *United*

*States v. Hyde*, No. 95-10156, 1996 U.S. App. LEXIS 4679, at *3

(9th Cir. Feb. 29, 1996) (unpublished) ("The government failed to

demonstrate that the firearms were sold or disposed of with a

profit motive. It only submitted evidence of clandestine

activity, opportunity, and financial incentive. . . . But not

even strong suspicions and informed speculations are quite

enough.  We are constrained to hold that no rational trier of

fact could have found beyond a reasonable doubt that Hyde dealt

in firearms.").

Finally, and perhaps most critically, the government failed

to provide sufficient evidence that Tyson actually sold firearms

and did so repetitively, as required by § 921(a)(21)(C).  While a

reasonable jury perhaps could have inferred that Tyson was

transporting firearms to the Virgin Islands to sell them, the

Court does not believe that Tyson's passing statements to an

airline employee about having a firearms buyer in the Virgin

Islands sufficiently establishes that he made *repetitive* firearms

sales, as the government was statutorily bound to prove.  Those

statements, without proof that Tyson actually sold firearms for

profit, essentially amount to mere puffery that, standing alone,

cannot sustain his conviction.[10] *See*, *e.g.*, *United States v.*

*Scofield*, 433 F.3d 580, 586 & n.4 (8th Cir. 2006) (directing the

district court to enter a judgment of acquittal with respect to

---

[10]   The Court also does not find that relatively minor ups
and downs in Tyson's personal finances are sufficient to show
that he engaged in the business of dealing firearms as that
phrase is statutorily defined.  To conclude that those
fluctuations were the result of illegal firearms purchases and
sales, without more, as opposed to legitimate income-generating
activities and expenditures, would be to engage in pure
speculation.

the defendant's conviction for possession with intent to
distribute methamphetamine where, among other things, the
defendant stated on an occasion that he was an "importer" of
methamphetamine, because that statement "was puffery in the
context of the overwhelming lack of evidence").

This is also not a case in which Tyson's statements amount
to attempted trafficking in firearms in violation of §
922(a)(1)(A). *Cf.*, *e.g.*, *United States v. Uca*, 867 F.2d 783 (3d
Cir. 1989). "Under federal law, attempt requires intent and
*conduct amounting to a substantial step* towards the commission of
the crime." *United States v. Ledesma-Cuesta*, 347 F.3d 527, 531
(3d Cir. 2003) (emphasis supplied) (quotation marks and citation
omitted); *see also United States v. Tykarsky*, 446 F.3d 458, 469
(3d Cir. 2006).

Here, even if the evidence were sufficient for a reasonable
jury to conclude that Tyson intended to sell firearms to a buyer
in the Virgin Islands and took the step of shipping those
firearms here for that purpose, there is insufficient evidence
that his conduct rose to the level of "engaging in the business
of dealing in firearms." The government's evidence on this point
seems scant indeed when juxtaposed with the far more robust
evidence described in decisions affirming § 922(a)(1)(A)
convictions. *See*, *e.g.*, *Bryan*, 524 U.S. at 189; *United States v.*

*White*, 175 Fed. Appx. 941, 942 (9th Cir. 2006) (unpublished);

*United States v. Orum*, 106 Fed. Appx. 972, 974 (6th Cir. 2004)

(unpublished); *United States v. Kubowski*, 85 Fed. Appx. 686, 687

(10th Cir. 2003) (unpublished); *United States v. Fridley*, 43 Fed.

Appx. 830, 833 (6th Cir. 2002) (unpublished); *United States v.*

*Dettra*, No. 99-3667, 2000 U.S. App. LEXIS 33715, *6-7  (6th Cir.

Dec. 15, 2000) (unpublished); *Allah*, 130 F.3d at 45-46; *United*

*States v. Beecham*, Nos. 92-5147 & 92-5399, 1993 U.S. App. LEXIS

13050, at *8 (4th Cir. June 2, 1993) (unpublished); *United States*

*v. Murphy*, 852 F.2d 1, 8 (1st Cir. 1988).

In light of the record's evidentiary paucity on this point,
the Court will grant Tyson's motion as it pertains to Counts Two
through Thirteen.[11]

## C.  Counts Fourteen through Twenty-Four: Unauthorized Possession of a Firearm

In Counts Fourteen through Twenty-Four, the government
charged Tyson with unauthorized possession of various firearms in
violation of V.I. CODE ANN. tit. 14, § 2253(a), which provides:

---

[11]  In its order for supplemental briefing, the Court ordered
the government to "cite to specific portions of the trial
transcript, and to relevant legal authority where appropriate, to
show that each element of each count on which Tyson was found
guilty is supported by sufficient evidence." (Order, Apr. 28,
2009.)  In response, the government recited some of the basic
facts regarding Tyson's purchase of firearms in Tennessee and
Tyson's travels from Tennessee to St. Thomas.  Importantly, the
government elected not to underscore a single page of trial
transcript regarding Tyson's sales of firearms for profit.

Whoever, unless otherwise authorized by law, has, possesses, bears, transports or carries either, actually or constructively, openly or concealed any firearm, . . . loaded or unloaded, may be arrested without a warrant, and shall be sentenced to imprisonment . . . .

Thus, to prove that Tyson was guilty of that offense, the government had to show that (1) Tyson knowingly possessed, carried or transported a firearm; (2) Tyson was not licensed or otherwise authorized to possess the firearm; and (3) the firearm was operable. *See Hunt v. Virgin Islands*, 46 V.I. 534, 539 (D.V.I. App. Div. 2005); *United States v. Blyden*, 740 F. Supp. 376, 380 (D.V.I. 1990); *Virgin Islands v. Albert*, 18 V.I. 21, 24 (D.V.I. 1980).

Here, the government marshaled sufficient evidence to sustain each element of Tyson's § 2253(a) convictions. Penny Stricklin, the ATF agent, testified about eleven firearms that were discovered in Tyson's luggage after he arrived in St. Thomas. (*See generally* Trial Tr. vol. 2, 285-91.) Those eleven firearms correspond to the firearms listed in Counts Fourteen through Twenty-Three.[12] Stricklin's testimony in this vein is sufficient to conclude that Tyson possessed those firearms.

The government also proved that Tyson was not authorized under Virgin Islands law to possess firearms. Karen Stout, the

---

[12] The jury found Tyson not guilty of Count Twenty-Four.

supervisor of the VIPD's Firearms Bureau for the District of St. Croix, testified that Tyson "never applied for a license to possess or carry a firearm in the District of St. Croix." (*Id.* at vol. 2, 265.) Elfreda Robinson, Stout's counterpart for the District of St. Thomas/St. John/Water Island, testified that Tyson never registered a firearm with the VIPD and is not licensed to possess a firearm in the Virgin Islands. (*Id.* at vol. 2, 269.)

Finally, Jay Quabius, an ATF special agent, testified that he tested the various firearms listed in Counts Fourteen through Twenty-Four. According to his testimony, ten out of the eleven firearms listed in those counts were operable. (*Id.* at vol. 2, 360-64.) Only the firearm indicated in Count Twenty-Four was inoperable. (*Id.* at vol. 2, 363.)

Based on the evidence outlined above, the Court concludes that the government met its burden of proving beyond a reasonable doubt that Tyson violated § 2253(a) with respects to Counts Fourteen through Twenty-Three. The Court will therefore deny his motion with respect to those counts.[13]

---

[13] Tyson fleetingly argues that he "was never given the opportunity to comply with the registration that was required." (Def. Tyson's Mem. Supp. Rule 29 at 4.) In essence, Tyson asserts that because he was arrested shortly after his arrival in the Virgin Islands, he was precluded from complying with V.I. CODE ANN. tit. 23, § 470(b). That may be so. However, that claim, at best, raises an affirmative defense, which a defendant

D.  **Count Twenty-Five: Transferring a Firearm to be Used in a Crime**

In Count Twenty-Five, Tyson was charged with transferring a

firearm to be used in a crime in violation of 18 U.S.C. § 924(b),

which provides:

> Whoever, with intent to commit therewith an offense
> punishable by imprisonment for a term exceeding one
> year, or with knowledge or reasonable cause to believe
> that an offense punishable by imprisonment for a term
> exceeding one year is to be committed therewith, ships,
> transports, or receives a firearm or any ammunition in
> interstate or foreign commerce shall be fined under
> this title, or imprisoned not more than ten years, or
> both.

---

must prove. *United States v. McKie*, 112 F.3d 626, 631 (3d Cir.
1997).  Tyson did in fact raise that defense and placed it
squarely before the jury:

> Now, there was a lot of talk, a lot of talk, with
> regards to failing to register.  And then we found out,
> well, you know, the law says you may do two things,
> immediately or in writing. . . . I am asking one
> fundamental question.  If you start off on the right
> foot by doing what is required, how could you ever end
> up in a position like this?  Because you were
> prevented, you were arrested on the airport road.  You
> were never taken in from the airport road, never taken
> to the Police Station and says: Listen, register them
> here.  We are here with you.  They never give him that
> opportunity, even though he started out on that road,
> to . . . declare these weapons.  Is that not a doubt?
> Is that not a doubt based on reason and common sense,
> that would make you hesitate in the most important of
> your functions in this life that you live?

(Trial Tr. vol. 3, 108-09, Jan. 16, 2009.)  The jury was
apparently unswayed by this argument.  In any event, Tyson's
noncompliance with § 470 does not signify the government's
failure to prove his § 2253(a) convictions.

The indictment states that the "offense punishable by
imprisonment for a term exceeding one year" in this case is
unauthorized possession of a firearm in violation of V.I. CODE
ANN. tit. 14, § 2253(a). A conviction for that offense mandates
a prison term of not less than one year. *Id.* To prove that Tyson
was guilty of the offense charged in Count Twenty-Five, the
government had to show that Tyson (1) knowingly shipped,
transported, or received a firearm or ammunition in interstate or
foreign commerce; and (2) intended to commit the offense of
unauthorized possession of a firearm or had knowledge or
reasonable cause to believe that the unauthorized possession of a
firearm was to be committed by another person. *See United States
v. Khan*, 309 F. Supp. 2d 789, 819 (E.D. Va. 2004), *rev'd on other
grounds*, 461 F.3d 477 (4th Cir. 2006).

At trial, the government proved beyond a reasonable doubt
that Tyson transported several firearms in interstate commerce.
The record abounds with testimony from airline employees and law
enforcement officials that Tyson boarded an airplane in Tennessee
with firearms and arrived in the Virgin Islands with those
firearms in tow. *See* 18 U.S.C. § 921(a)(2) (stating that
interstate commerce "includes commerce between any place in a
State and any place outside of that State, or within any
possession of the United States" and that "[t]he term 'State'

includes possessions of the United States"); *United States v. Hyde*, 37 F.3d 116, 121 (3d Cir. 1994) (noting that the Virgin Islands is a United States possession).

The Court has little confidence, however, that the government met its burden with respect to the second element of a § 924(b) offense. That element essentially delineates two ways a defendant may violate § 924(b), assuming § 2253(a) is the predicate offense. First, a defendant may violate § 924(b) if he transports a firearm in interstate commerce with the intent to possess that firearm without authorization. Second, a defendant may violate § 924(b) if he transports a firearm in interstate commerce and knows or has reasonable cause to believe that another person will possess it without authorization.

Here, as discussed above, the government presented evidence of Tyson's various firearms purchases and travels from Tennessee to the Virgin Islands with firearms. In addition, Karen Stout and Elfreda Robinson, the VIPD officers, testified that Tyson was not licensed to possess a firearm in the Virgin Islands and that the firearms found in Tyson's luggage were not registered in the Virgin Islands. Various other law enforcement officials testified that Tyson was arrested alongside Morrell and Thomas after arriving in St. Thomas with firearms. The record also includes testimony that before July 31, 2008 Tyson traveled from

Tennessee to St. Thomas with firearms, none of which was

registered with Virgin Islands authorities and most of which have

not been found.

Based on this evidence, the government "submits it was

reasonable for the jury to infer . . . that [Tyson] knew, or had

reasonable cause to believe that the firearms he brought

illegally into the Virgin Islands would not be registered. (Pl.'s

Rule 29 Supp. Br. 5.)  The government contends that "[t]his

rationale is based upon his prior conduct after his arrival in

St. Thomas, by failing to register the weapons and transporting

them to other people, and that by obliterating the serial number

on the weapons[14], it would eliminate any evidence linking him as

the purchaser of the weapons. (*Id.*)  The government has nothing

else to say on Count Twenty-Five.  The Court is unconvinced.[15]

---

[14]  As noted earlier, the government adduced evidence that a
firearm Tyson purchased in Tennessee was found in St. Thomas in
the possession of Jelanie LaTorre and that LaTorre had previously
wired money to Tyson.  That firearm had an obliterated serial
number.  The government's reliance on this testimony to support
Tyson's § 924(b) conviction is unavailing.  While there may be
suspicion and speculation that Tyson transported a firearm to
obliterate its serial number, there was no evidence offered that
Tyson transported that firearm for that purpose.  A firearm with
an obliterated serial number in the hands of a person, standing
alone, is not sufficient proof that another person was the source
for the uncorrupted firearm and transported it with knowledge
that its serial number would be obliterated.

[15]  The Court notes that only a handful of federal cases
address § 924(b) in the Rule 29 context.  Those cases either do
not have full discussions of the prosecution's evidence or are

The evidence on which the government relies is insufficient to show that Tyson violated § 924(b) by transporting a firearm with the intent to commit the crime of unauthorized possession of a firearm. The mental jujitsu required to understand the government's theory strains logic. Indeed, the government suggests that Tyson legally possessed a firearm, only to knowingly ship it to himself with the intent of again possessing it without authorization. In the Court's view, it is difficult to imagine how any intent on Tyson's part to violate the predicate crime alleged here could be inferred. Tyson was arrested almost immediately upon arrival in St. Thomas. He was therefore given no opportunity to evince an intent to commit that offense. That circumstance, as noted earlier, may not be germane to Tyson's § 2253(a) conviction. *Cf. United States v. McKie*, 112 F.3d 626, 630 (3d Cir. 1997) ("[W]e hold § 470 is not an element of the offense of unlawful firearm possession under V.I. CODE ANN. tit. 14, § 2253, but rather is an affirmative defense."). It certainly assumes importance, however, in the context of his § 924(b) conviction where, as here, proof of an intent to violate § 2253(a) is required. In essence, the government asked the jury to infer "intent on intent" and now asks the Court to locate evidence of this double-layered intent in the record. After an

---

factually inapposite.

exhaustive review, the Court sees no record evidence -- and the
government has pointed to none -- based on which such intent may
be inferred. *Cf. United States v. Krug*, 20 Fed. Appx. 271, 276-77
(6th Cir. 2001) (unpublished) (affirming a § 924(b) with a
predicate offense of murder where the government presented
evidence that the defendant was found with a file on the would-be
victim, pictures of his house, directions to his house, maps
surrounding his house, as well as a to-do list in which the
defendant had made a notation about killing the victim).

There is also insufficient evidence that Tyson knew or had
reasonable cause to believe that another person would commit the
crime of unauthorized possession of a firearm Tyson provided.
True, the government adduced evidence that Tyson transported
firearms from Tennessee to the Virgin Islands.  There is
absolutely no evidence, however, that Tyson knew or had
reasonable cause to believe either that anyone to whom he
transferred those firearms was unauthorized to possess a firearm
under Virgin Islands law or that those firearms were not properly
registered in accordance with Virgin Islands law.  Again, despite
the Court's invitation, the government chose not to spotlight any
portion of the record to compel a contrary conclusion.

Viewing the evidence in the light most favorable to the
government, no rational trier of fact could have found proof

beyond a reasonable doubt that Tyson violated § 924(b). The

Court therefore will grant the motion with respect to Count

Twenty-Five.

**E.    Count Twenty-Six: Transferring Firearms to an Out-of-State Resident**

Count Twenty-Six charged Tyson with transferring firearms to

an out-of-state resident in violation of 18 U.S.C. § 922(a)(5).

That offense required the government to prove that (1) Tyson

willfully transferred, transported or delivered a firearm to

another person; (2) neither Tyson nor the person to whom the

firearm was transferred was licensed as a firearms importer,

manufacturer, dealer, or collector at the time of such transfer;

and (3) Tyson knew or had reasonable cause to believe that the

person to whom the firearm was transferred was not a resident of

the same State in which the defendant resided. To have

"reasonable cause to believe" that someone is a resident of

another state means to have knowledge of facts which, although

not amounting to direct knowledge, would cause a reasonable

person knowing the same facts to reasonably conclude that such

other person was a resident of another state.

In *United States v. Hayden*, 64 F.3d 126 (3d Cir. 1995), the

defendant was charged with violating 18 U.S.C. § 922(n).[16]  §

_____

[16]  18 U.S.C. § 922(n) provides as follows:

922(n), like § 922(a)(5), has a corresponding penalty provision

codified at 18 U.S.C. § 924(a)(1)(D), which provides:

> (a)(1) Except as otherwise provided in this subsection,
> subsection (b), (c), or (f) of this section, or in the
> section 929, whoever --
>
> (D) willfully violates any other provision of this
> chapter, shall be fined not more than $5,000,
> imprisoned not more than five years, or both.

In *Hayden*, the Third Circuit reviewed the legislative

history and the statutory context in which the word "willfully"

appears in the above provision.  The court explained that "[i]n

defining 'knowingly,' courts have almost uniformly rejected

arguments that the term requires the defendant know his conduct

was unlawful; rather, they have interpreted 'knowingly' merely to

require that the defendant know he was engaging in the prohibited

conduct." *Hayden*, 64 F.3d at 130 (listing cases).  The court

concluded, in light of the legislative history it had examined,

that "it is difficult to understand what more the 'willfully'

language could require, if not knowledge of the law." *Id.*

(citation omitted).  Accordingly, the Third Circuit held that

"because of the legislative history and the context in which

---

> It shall be unlawful for any person who is under
> indictment for a crime punishable by imprisonment for a
> term exceeding one year to ship or transport in
> interstate or foreign commerce any firearm or
> ammunition or receive any firearm or ammunition which
> has been shipped or transported in interstate or
> foreign commerce.

'willfully' and 'knowingly' were added simultaneously to
different provisions of the same statutory subsection, . . .
*'willfully' in § 924(a)(1)(D) means the defendant must have acted*
*with knowledge that his conduct was unlawful.*" *Id.* (emphasis
supplied).

Other federal courts of appeals have similarly interpreted §
924(a)(1)(D) to mean that a defendant may be convicted of
violating § 922(a), including § 922(a)(5) in particular, only if
the government proves that the defendant had actual knowledge of
the law he is charged with violating. *See United States v.*
*Rodriguez*, 132 F.3d 208, 211 (5th Cir. 1997) ("Thus, we find that
knowledge of the law is required for a conviction under §§
922(a)(5) and 924(a)(1)(D)."); *United States v. Sanchez-Corcino*,
85 F.3d 549, 553-54 (11th Cir. 1996) ("Accordingly, we too
conclude that in order for the Government to prove the offense of
willfully dealing in firearms without a license under §§
922(a)(1)(A) and 924(a)(1)(D), it must prove that the defendant
acted with knowledge of the licensing requirement."); *United*
*States v. Obiechie*, 38 F.3d 309, 315-16 (7th Cir. 1994) ("In our
view, the only reasonable distinction between section 924(a)(1)'s
'knowingly' and 'willfully' standards is that the latter requires
knowledge of the law."); *United States v. Hern*, 926 F.2d 764, 767
& n.6 (8th Cir. 1991) ("'[W]illful' means an intentional

violation of a known legal duty."); *but see United States v.*
*Andrade*, 135 F.3d 104, 110 (1st Cir. 1998) ("Admittedly, two
other circuits say that conviction requires proof that the
defendant was aware of the licensing requirement itself, but we
do not find these cases persuasive." (citations omitted)); *Allah*,
130 F.3d at 39-40.[17]

Here, the government failed to present any direct evidence
to show that Tyson knew that he was subject to a licensing
scheme. The absence of such evidence, on its own, does not lead
inexorably to an insufficiency finding, as circumstantial
evidence of Tyson's knowledge may also support his conviction on
this count. *See Rodriguez*, 132 F.3d at 212. The Court, however,
has unearthed no such evidence in the record. Indeed, the record
shows that on several occasions Tyson freely and openly declared
his possession and transportation of firearms to airline
personnel and law enforcement authorities. In sum, there is
simply no evidence that Tyson knew he was violating § 922(a)(5).
*See*, *e.g.*, *Hayden*, 64 F.3d at 134 (vacating a § 922(n) conviction
where the district court precluded the defendant from showing
that he did not have knowledge that he was violating § 922(n)

---

[17] Although there does not appear to be any Third Circuit
precedent directly on point, the weight of authority clearly
indicates that a § 922(a)(5) conviction may stand only if the
government proves that the defendant actually knew of the law he
is charged with violating.

because such evidence is an element of that offense); *cf.*

*Rodriguez*, 132 F.3d at 212 (upholding a § 922(a)(5) conviction

based on circumstantial evidence to permit the jury to infer that

the defendant had knowledge of the law where the defendant "knew

that there was generally something illegal going on at the Burger

King that day, for on the way to the restaurant she stated her

concerns about the nature of the transaction and expressed a

desire to abort it").

Accordingly, because the government failed to prove an

essential element of a § 922(a)(5) offense, Tyson's conviction on

Count Twenty-Six must be vacated.

### IV. <u>CONCLUSION</u>

The Court is well aware of the statutory framework that

seeks to arrest illegal firearms trafficking. In assessing

whether the government has adduced sufficient evidence to prove

that a defendant has run afoul of the relevant firearms statutes,

the Court must juxtapose the defendant's conduct with the subject

statute. Undertaking that exercise with respect to Tyson yields

certain elemental conclusions. First, Tyson bought a large

volume of firearms in Tennessee. Second, he transported those

firearms from Tennessee to the Virgin Islands. Third, there is

some possibility that this conduct constitutes evidence of

firearms trafficking. That possibility, however, does not

talismanically transform suggestive evidence into legally

sufficient evidence.  This is especially the case where, as here,

there is an absence of proof that satisfies the statutory

mandate.

The Court is mindful of the great challenges that arise in

the law enforcement arena.  Law enforcement agents frequently

confront heart-fluttering situations that necessitate on-the-spot

decisions.  By definition, such decisions are taken without the

benefit of full-blown reflection.  Understandably, the focus in

the first instance is on arresting perceived criminal conduct,

not deliberating on whether all of the elements of a particular

crime will be provable at trial.  The possible downside of this

approach is clear: sometimes such urgent arrests stunt the

development of the necessary foundation for conviction.  The

government's prosecution may very well be a casualty of that

reality.

The Court does not doubt the government's good intentions in

prosecuting Tyson, as his conduct raised an inference that

something untoward was afoot.  The government's suspicions and

good intentions notwithstanding, the federal statutes the

government charged Tyson with violating call for more than the

government offered here.[18]

For the reasons given above, Tyson's motion for a judgment of acquittal will be granted in part and denied in part.  An appropriate judgment follows.

S\_____
                        **CURTIS V. GÓMEZ**
                           **Chief Judge**

---

[18]  For example, even an attempt to sell a firearm to a confidential informant or an undercover officer in the Virgin Islands would likely result in this Court sustaining the jury's verdict with respect to the charge of transferring firearms to an out-of-state resident.  Yet, no such evidence was ever adduced.